IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 2:23-cr-43-RAH-JTA |
| | ) | |
| ANTWAN HARDY | ) | (WO) |

## **RECOMMENDATION OF THE MAGISTRATE JUDGE**

This cause is before the court on Defendant Antwan Hardy's motion to suppress in which he challenges the protective sweep of a hotel room on December 10, 2022. (Doc. No. 22.) After due consideration of the parties' arguments, evidence and applicable law, the undersigned concludes that the motion to suppress is due to be denied.

### I. PROCEDURAL HISTORY

Hardy is charged in this case with two counts of possession of a firearm by a convicted person, in violation of 18 U.S.C. § 922(g)(1); one count of possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1); and one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). (Doc. No. 15.) Hardy entered a plea of not guilty during his arraignment. (Doc. No. 17.)

Hardy filed his motion to suppress evidence on February 7, 2023. (Doc. No. 22.) The Government filed a response to the motion (Doc. No. 29), and Hardy filed a reply (Doc. No. 37). The undersigned conducted an evidentiary hearing on the motion on March 2, 2023. (Doc. No. 41, Transcript of Evidentiary Hearing.) Hence, the motion is ripe for review.

## II.  FINDINGS OF FACT[1]

During the evidentiary hearing, the court heard testimony from David Shirah and Roderick D. Calhoun, two corporals with the Montgomery Police Department ("MPD").[2] (Doc. No. 41, Tr.)  The testimony and evidence adduced at the hearing establish the following facts.[3]

On December 10, 2022, between 7:00 a.m. and 7:30 a.m., a gas station located on the Eastern Boulevard in Montgomery was robbed.  MPD received a 911 call reporting the robbery.  Calhoun was the first officer on the scene and Shirah was one of the other responding officers.[4]  Shirah reviewed the store's video surveillance system and observed images of the robber.  Shirah described the robber as a Black male wearing a black jacket and blue pants.  The robber possessed a small handgun in a "bright blue frame." (Doc. No. 41, Tr. at 8.)  Shirah observed the robber exit the store and make an immediate right.  The gas station employee advised that the robber entered a red sedan[5] that was parked next door at an abandoned business and then the robber drove into the neighborhood behind the gas

---

[1] The undersigned reaches findings of fact at a suppression hearing based on a preponderance of the evidence. *United States v. Beechum*, 582 F.2d 898, 913 n.16 (5th Cir. 1978) (citation omitted).

[2] Shirah and Calhoun have been employed with the Montgomery Police Department for eight years. (Doc. No. 41, Tr. at 5, 58.)  At all relevant times, both were assigned to the Patrol Division.  (*Id.*)

[3] The undersigned finds the testimony of both witnesses to be credible.

[4] Shirah and Calhoun wore body cameras during this incident and the recordings were admitted into evidence.  The recordings corroborate their testimony.

[5] According to Calhoun, witnesses stated that the robbery suspect left in a maroon vehicle back into the neighborhood.  (Doc. No. 41, Tr. at 59.)  Although Calhoun and Shirah testified that the suspect vehicle was red or maroon in color, the undersigned will refer to the vehicle as red herein for the sake of uniformity in the Recommendation.  (*Id.* at 33, 59.)

station. Law enforcement utilized a license plate reader in the area to reveal that a red Hyundai with an Ohio license plate was in the area just minutes after the 911 call was received by MPD dispatch. Law enforcement then placed a BOLO or "be on the lookout" for that vehicle.

Calhoun was one of the officers tasked with finding the red Hyundai. He located the vehicle at the Key West Inn on Troy Highway two to three hours[6] after the 911 call was received by MPD. Shirah responded to the Key West Inn and spoke to hotel management.[7] Shirah reviewed footage from the hotel video surveillance system with hotel management for 20-40 minutes.[8] In the footage, Shirah observed the red Hyundai enter and park in the hotel parking lot a few minutes after the robbery. A Black male, wearing the same bright blue pants as the robbery suspect, exited the red Hyundai.[9] Shirah also observed that the Black male placed a bright blue handgun into his front pocket and entered a hotel room located on the ground floor. The hotel management advised Shirah that only two rooms on the ground floor, rooms 119 and 121, were occupied. The hotel

---

[6] Calhoun testified that he located the red Hyundai at the hotel at approximately 10:00 a.m. (Doc. No. 41, Tr. at 60.) The Hyundai was parked and unoccupied. (*Id*.)

[7] Calhoun testified that five to ten officers responded to the hotel. (Doc. No. 41, Tr. at 60-61.)

[8] The time Shirah spent reviewing the hotel video footage is imprecise. Shirah testified on direct examination that he reviewed video footage from the hotel for 30-40 minutes and then testified on cross examination that his review lasted only 20-30 minutes. (Doc. No. 41, Tr. at 25, 36.)

[9] Shirah took a photograph of the video footage showing the robbery suspect exit the red Hyundai at 7:46 a.m. (Doc. No. 41, Tr. at 31-33.) Calhoun also saw this video footage. (*Id*. at 61.)

3

management[10] identified room 119 as the room entered by the robbery suspect.[11] Shirah also observed the robbery suspect exit the hotel room once or twice,[12] go to the red Hyundai and then return to room 119.[13] After reviewing this footage of the hotel surveillance video, Shirah ceased watching the footage and returned to the parking lot.

Around 11:00 a.m., Shirah notified MPD Detective Sheeran that the suspected robbery vehicle had been located and video evidence existed showing the robbery suspect enter room 119. Detective Sheeran advised Shirah to stand by, hold the perimeter, and detain any individual who departed room 119 because a search warrant for the room was being sought. At that time, Shirah and Calhoun believed that the robbery suspect was possibly still inside room 119.

While Shirah and the other officers awaited the search warrant, three individuals exited room 119. First, a Black female exited room 119. She informed law enforcement that two other people were located inside the room.[14] Second, a Hispanic or Black male in a plaid shirt exited room 119. He informed law enforcement that one Black male remained in the room. Shirah testified that he "had a pretty good belief" that the remaining person in

---

[10] Shirah testified that he met with the hotel manager while Calhoun testified that they met with the hotel owner or manager. (Doc. No. 41, Tr. at 11, 61, 76-77.) After seeing the video footage, Calhoun departed the lobby and maintained surveillance of room 119. (*Id*. at 62, 72-73.) Calhoun did not observe the video footage of the robbery suspect entering room 119. (*Id*. at 72-73, 79.)

[11] (Doc. No. 41, Tr. at 61-62.)

[12] At some point, the robber changed out of the blue pants. (Doc. No. 41, Tr. at 34-35.)

[13] (Doc. No. 41, Tr. at 42, 49-50.)

[14] The female informed law enforcement that she was in a room with two Black males. (Def. Ex. 6, Calhoun Body Camera Video 16:52-17:03.)

4

room 119 was the robbery suspect. (Doc. No. 41, Tr. at 16.) Third, a Black male, later identified as Hardy, exited room 119. After Hardy exited room 119 and the hotel door locked, he was placed in handcuffs and detained by Calhoun.[15] Calhoun asked Hardy if he was the only one in that room and Hardy responded affirmatively.

Shirah testified that he believed the robbery suspect was still located in room 119 so he used a master key provided by hotel management to enter the room.[16] Law enforcement cleared the room, "looking for where a person could hide[,]"[17] and no one was discovered in room 119. However, law enforcement did observe multiple firearms, including the firearm with a blue handle similar to the one held by the robbery suspect, under the bed closest to the bathroom. Law enforcement then exited the room and continued to await the search warrant. Detective Sheeran arrived with the search warrant and the officers executed the warrant.

---

[15] (Doc. No. 41, Tr. at 65-66.) Shirah testified that he had no knowledge as to whether Hardy was the robbery suspect at that time. (*Id*. at 45.) Similarly, Calhoun testified that Hardy matched the description of the robbery suspect. (*Id*. at 68, 71.) Calhoun testified that Hardy was detained and not arrested. (*Id*. at 77.) Calhoun also testified that he believed the occupants of room 119 had been involved in criminal activity because the driver of the red Hyundai entered that room. (*Id*. at 78.)

[16] Shirah testified that this belief was based on the continued presence of the red Hyundai in the parking lot and the hotel video footage he observed showing the robbery suspect enter room 119. (Doc. No. 41, Tr. at 51-52.)

[17] (Doc. No. 41, Tr. at 18.) Specifically, Shirah testified that law enforcement looked under the two hotel beds, cleared the bathroom and searched behind bags of clothes for persons. (*Id*. at 18-19.)

Shirah returned to the hotel lobby and resumed watching footage from the hotel surveillance video to determine when the robbery suspect exited room 119.[18] It was then that Shirah observed on the video[19] that the robbery suspect had entered a black Tahoe and left the scene. This departure by the robbery suspect occurred approximately 20 minutes prior to the discovery of the red Hyundai by Calhoun. While law enforcement was present at the hotel, the red Hyundai did not leave the parking lot.

Law enforcement obtained a state search warrant for room 119 at 1:00 p.m. Law enforcement executed the search warrant and recovered drugs, over $3,000 in cash, and eight firearms, including the firearm in the bright blue frame that was used by the robber.

### III. DISCUSSION

The only issue before the court is whether the protective sweep of room 119 was unconstitutional. Hardy contends that the protective sweep of room 119 was in violation of the Fourth Amendment because law enforcement lacked sufficient information to justify a protective sweep.[20] The Government responds that law enforcement had sufficient, reasonable information to support a protective sweep of room 119. Based on the facts

---

[18] (*See* Doc. No. 41, Tr. at 40-41.) ("Once we saw him enter that room, we didn't – we put a pause on watching the video until after everyone was taken into custody, and then I returned to continue watching video to see where the suspect went.")

[19] In total, Shirah reviewed approximately 2.5 hours of video from the hotel surveillance recording. (Doc. No. 41, Tr. at 25, 36.) During that time, Shirah observed the robbery suspect repeatedly enter and exit room 119. (*Id.* at 28, 35, 36, 41, 42.) Shirah also testified that on the hotel video "there was a lot of movement between room 119 and a room on the second floor. So we were unsure if [the robbery suspect] could possibly be in that room as well." (Doc. No. 41, Tr. at 37.)

[20] Hardy concedes he was arrested in his reply (Doc. No. 37) and does not challenge the legality of his arrest in his motion (Doc. No. 22 at 5-6, Issues Presented). Nor does Hardy dispute that probable cause existed to support the search warrant. (*See* Docs. No. 22, 37.)

6

before the court, the undersigned concludes that the protective sweep comported with the Fourth Amendment.

"The Fourth Amendment guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Whren v. United States*, 517 U.S. 806, 809 (1996).[21]  This right extends to a hotel room. *See United States v. Ramos*, 12 F.3d 1019, 1023 (11th Cir. 1994) ("[I]t is well-settled that a person does not forfeit Fourth Amendment protection merely because he is residing in a hotel room.") (citations omitted). "Use of a [h]otel room for lodging provides the same expectation of privacy as does a home." *Id*. (citations omitted).

The Supreme Court has emphasized that the touchstone of the Fourth Amendment is reasonableness, "measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). A warrantless search or seizure is presumptively unreasonable, unless an exception to the warrant requirement applies. *United States v. Berrong*, 712 F.2d 1370, 1372 (11th Cir. 1983).

> One exception to this rule is the "protective sweep," which is "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990). The sweep must be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.*

*United States v. Yarbrough*, 961 F.3d 1157, 1163 (11th Cir. 2020).

---

[21] "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). A "seizure" occurs when an individual's possessory interest in certain property is meaningfully interfered with. *Id*.

In *Buie*, the Supreme Court held that a properly limited protective sweep is reasonable under the Fourth Amendment when conducted incident to an arrest and "when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." 494 U.S. at 337. Such sweeps are permitted because of the "interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." *Id*. at 333.

Considering the totality of the circumstances, the undersigned finds that the officers in this case knew specific and articulable facts which gave rise to a reasonable suspicion justifying a protective sweep. As the record reflects, the officers had knowledge that a Black male robbed a gas station and that same individual shortly thereafter entered the Key West parking lot in the same vehicle – the red Hyundai – utilized to depart the gas station. The officers also had knowledge that the robber, an individual armed with a gun in a bright blue frame, had entered room 119. Shirah had knowledge that the robber, after changing his pants, exited room 119 and re-entered the room. The officers further had knowledge that two males, at least one of them was reported to be a Black male, were located in room 119 after the female departed the room, thus they had reason to believe that the robber could be inside room 119. Finally, the officers had knowledge that after the first male departed room 119, that a Black male remained in the room. Testimony establishes that the officers were uncertain whether the defendant – the last person to exit room 119 – was the

robbery suspect but had a reasonable belief that he could be the robber or the robber could still be in room 119.

Bearing in mind the defendant may not have been the robber, the officers had numerous reasons to be cautious and conduct a protective sweep. First, it was reported that the robbery suspect used a firearm during the gas station robbery and the officers observed on the hotel surveillance video that the robber entered room 119. Second, Shirah observed on the hotel surveillance video that the robber was armed when he exited the red Hyundai and first entered room 119 which suggested that the robber was armed while in room 119. Third, the presence of the parked red Hyundai in the parking lot buttresses the belief of the officers that the armed robber was still in the room 119. The officers had no knowledge that the robber was using another vehicle. Fourth, the officers observed multiple individuals enter and exit room 119[22] which suggests that other people could have been in the room. Hence, these details provided specific, articulable facts under which the officers could reasonably justify a limited sweep of room 119 to secure their safety.

Finally, the sweep lasted a few minutes and was narrow in scope. "The brevity of the sweep is a point in favor of its justification." *Yarbrough*, 961 F.3d at 1165 (citations omitted). No evidence in the record shows that the officers searched areas other than where an individual might reasonably find someone hiding. *See id*. Hence, the protective sweep was proportionate and reasonable.[23]

---

[22] The hotel room activity is discussed in the body camera recordings.

[23] The defendant's reliance on *United States v. Chaves*, 169 F.3d 687 (11th Cir. 1999) is misplaced. In *Chaves*, law enforcement waited approximately forty-five minutes outside a warehouse with the arrestees in custody before law enforcement forcefully entered the warehouse and conducted a

## IV.  CONCLUSION

For the reasons stated above, it is the RECOMMENDATION of the Magistrate Judge that the motion to suppress (Doc. No. 22) be DENIED.  It is further

ORDERED that the parties shall file any objections to the said Recommendation not later than **April 28, 2023.**  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file a written objection to the Magistrate Judge's findings and § 636(b)(1) shall bar a *de novo* determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of a party to challenge on appeal the District Court's order based on unobjected-to-factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  11th Cir. R. 3-

---

sweep which lasted five to ten minutes.  The Circuit found that the delay between the arrests and the sweep "undermines any claim that the entry had a protective purpose" because the "officers simply sat in their cars outside the warehouse."  *Id*. at 692.  Hence, the officers "saw no immediate need to enter the warehouse to protect themselves or other persons in the area."  *Id*.  That is not the case here.  In the instant case, the officers immediately entered room 119 after the defendant was handcuffed.  There was no delay.  In addition, in *Chaves*, the government had no information regarding the possible presence of persons in the warehouse.  *Id*. ("[N]one of the agents were able to see inside the warehouse and none of the agents offered any concrete factual basis for believing that there [were] . . . other individuals inside the warehouse.").  In this case, Shirah had observed on the hotel surveillance video that the robber had entered room 119 and had knowledge that the red Hyundai, the vehicle used by the robber in the robbery, was parked and unoccupied in the hotel parking lot.  Therefore, the officers in this case had a concrete factual basis for believing that the robber was inside room 119.

1; *Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

  DONE this 14th day of April, 2023.

*/s/ Jerusha T. Adams*
JERUSHA T. ADAMS
UNITED STATES MAGISTRATE JUDGE